**Patrol Officer Joseph McGRATH, et al.**

v.

**CITY OF PHILADELPHIA.**

Civ. A. No. 92–4570.

United States District Court,
E.D. Pennsylvania.

Sept. 9, 1994.

Thomas H. Kohn, Sagot, Jennings & Sigmond; Michael R. Kopac, Sacks, Basch, Brodie & Sacks, Philadelphia, PA and Robert E. Deso, Deso, Thomas and Rost, P.C., Washington, DC, for plaintiffs.

Zane D. Memeger, Thomas P. Hogan, Jr., Michael J. Ossip, and Mark J. Foley, City of Philadelphia Law Dept., Philadelphia, PA, for defendant.

Thomas H. Kohn, Sagot, Jennings & Sigmond, Philadelphia, PA, for respondent.

## MEMORANDUM AND ORDER

HUTTON, District Judge.

Presently before the Court is the defendant City of Philadelphia's Motion for Summary Judgment as to Liability, the plaintiffs' Motion for Summary Judgment, the defendant's response and the plaintiffs' reply.

## I. INTRODUCTION

This case is one of first impression in this circuit concerning the application of various provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq. There are thirteen named plaintiffs, representing various ranks within the Police Department of the City of Philadelphia ("City") ranging from Patrol Officer to Chief Inspector. Pursuant to the opt-in provision of the FLSA, over 4,000 members of the Philadelphia Police Department have joined in this action. They allege that the City violated and continues to violate the FLSA's overtime compensation provision.

## II. FACTUAL BACKGROUND

The plaintiffs' FLSA claims revolve around the following two related sets of facts: (1) compensation paid to plaintiffs working the current shift schedule, known as the "Flex Schedule"; and (2) compensation paid to plaintiffs at the rank of Captain and above. In turn, the Court will briefly trace the development of each of these factual settings.

### A. The Genesis of the Flex Schedule

Before 1990, the plaintiffs worked a schedule known as the "6–2 Schedule". Under the 6–2 Schedule, the plaintiffs worked for six days followed by two days off. The 6–2 Schedule included a "backwards rotation." In other words, an officer worked the 12:00 a.m. to 8:00 a.m. shift during one 6–2 rotation period, the 4:00 p.m. to 12:00 a.m. shift for his or her next rotation, the 8:00 a.m. to 4:00 p.m. shift next, then back to the 12:00 a.m. to 8:00 a.m. shift. While the 6–2 Schedule was in effect, employees were regularly scheduled to work 8 hour shifts.

Employees of the Police Department are paid according to the provisions of the applicable collective bargaining agreement ("1988 CBA" or "CBA") between the FOP and the City. Under the CBA, employees were to be paid overtime for all hours worked in excess of forty hours per week. The 1988 CBA, which was in effect between July 1, 1988 and June 30, 1990, was renewed on July 1, 1990 ("1990 CBA" or "CBA"). It continued to provide for overtime when an employee works in excess of forty hours in a particular week.

The Fraternal Order of Police ("FOP"), the official bargaining representative of the police officers employed by the City, and its members, referred to the 6–2 Schedule as the "Killer Shift". Recognizing that there was widespread dissatisfaction among the FOP and its members with respect to the 6–2 Schedule, the City agreed to fund a Shift Change Study Committee, which was composed of representatives of the FOP and the City. However, despite numerous attempts, the FOP and the City were unable to agree to a new schedule. Therefore, as required under the collective bargaining agreement then in effect between the parties, the issue was referred to an Act 111 Arbitration Panel ("Panel").

The FOP and the City each submitted their proposed new schedules to the Panel. On November 21, 1989, the Panel rendered its decision. The decision (hereinafter "Arbitration Award") adopted a schedule referred to as the "5–2, 4–2 Flex Schedule" or, alternatively, the "4–2, 5–2 Flex Schedule" ("Flex Schedule").

The Flex Schedule divides the Police Department into three platoons, with seven squads in each platoon. Under the Flex Schedule, each squad would work a basic 13 day cycle, consisting of five work days, followed by two days off, then four work days followed by two days off. For Platoon 3, this 13 day cycle never changes. For platoons 1 and 2, the 13 day rotation is altered once every three months. More specifically, for platoons 1 and 2, the rotation goes to 5–2, 5–2, 3–2, 5–2, then returns to the regular 5–2, 4–2 or 4–2, 5–2 cycle. The Flex Schedule increased the plaintiffs' normal work day shift from 8 hours to 8.25 hours per day. The plaintiffs are paid at their regular rate of pay for each 8 hour and fifteen minute shift.

On November 22, 1989, the day after the Arbitration Award, the FOP distributed a News Bulletin announcing that "The Killer Shift which has destroyed our members since 1957 is dead!" The City also announced the adoption of the Flex Schedule. Specifically, then-Commissioner Willie Williams sent an Informational Memorandum ("Commissioner's Memorandum") to all police personnel, announcing the new schedule. The Commissioner's Memorandum stated that the highlights of the new schedule included a 13 day rotation—"generally, four days worked and two days off, followed by five days worked and two days off." Pursuant to the Arbitration Award, the City implemented the Flex Schedule beginning on January 8, 1990 and the Flex Schedule has been utilized by the Police Department since that date.

Overtime for sworn members of the Philadelphia Police Department, such as the plaintiffs, is credited on a daily basis during each pay period in the following manner. If an employee subject to the Flex Schedule works less than 15 minutes over their scheduled shift (up to 8 hours and 29 minutes), the employee receives no overtime. If an employee subject to the Flex Schedule works 15 to 29 minutes over their scheduled shift (at least 8 hours and 30 minutes up to 8 hours and 44 minutes), he or she receives overtime credit for ½ hour. If an employee subject to the Flex Schedule works 45 minutes or more over their scheduled shift, (at least 9 hours) he or she receives overtime credit for a full hour.

### B. *The Genesis of the Claims by Commanders at the Rank of Captain and Above*

Police personnel at the rank of Captain and above ("Commanders") also work the Flex Schedule. They receive a set annual salary, as reflected in a pay schedule adopted by the City. This salary is based on the Commander's rank and longevity with the Police Department. Commanders receive their annual salary in bi-weekly payments.

Pursuant to the 1990 collective bargaining agreement ("1990 CBA"), Commanders receive compensatory time for time worked beyond their scheduled shift on an "hour for hour" basis—one extra hour worked results in one hour of compensatory time accrued. Commanders accrue time in their compensatory time bank, their sick time bank, their vacation time bank and their holiday time, based on time served on the Department. If an official in the rank of Commander is absent from work for less than a day, the time missed is deducted from the time accrued in their compensatory time, sick time, vacation time or holiday time bank, if there is any balance in any of these time banks. If there is no balance in any of the time banks, pay is deducted for the time missed. The formula for determining the amount of leave time to be deducted is set out in the Philadelphia Police Department Directive 66, dated March 4, 1991.

### C. *The Complaint*

The plaintiffs' Amended Complaint, filed on December 24, 1992, contains four counts. Count I is comprised of active and retired plaintiffs at the rank of patrol officer and all other plaintiff/members of the Police Department, active and retired, who worked the Flex Schedule since January 8, 1990. These plaintiffs claim that under the Flex Schedule they work an 8.25 hour shift, which amounts to 41.25 per week. They claim that such a schedule violates the FLSA's forty hour workweek requirement in that it requires them to work a minimum of 1.25 hours of overtime per week without compensation.

The City, of course, disputes the plaintiffs' assertion that they are entitled to any overtime compensation under the FLSA. First, the City argues that it is exempt from the FLSA's forty hour workweek provision because it has adopted an alternative "work period" of 13 days pursuant to § 207(k). Alternatively, the City argues that the plaintiffs in Count I are not entitled to any overtime compensation because they receive a 30 minute paid meal period, which does not constitute compensable "work" time under the FLSA. The City argues that, even assuming it is subject to the forty hour workweek requirement, it owes no overtime compensation once the 30 minute meal period is deducted from each shift worked.

Count II contains the claims of a second group of plaintiffs. These plaintiffs include current and retired employees at the rank of Sergeant or Lieutenant. Count II also encompasses the claims of individuals who formerly worked as Sergeants and Lieutenants, and who have subsequently been promoted, but have not yet retired. These plaintiffs assert that since April 15, 1986, they were required to report to work fifteen minutes before the beginning of each shift to prepare for roll call. Thus, this second group of plaintiffs contend that they are required to work 8.50 hours per shift under the Flex Schedule, or 42.50 hours of work per week, also allegedly in violation of the FLSA standard forty hour workweek. The plaintiffs in Count II, as well as those in Count I, also assert that the City's method of computing overtime contravenes the FLSA in that it results in their having to work time for which they are not compensated at all, let alone at time and a half as required by FLSA.

As with Count I, the City asserts that it owes no overtime to the plaintiffs in Count II because it has adopted a § 207(k) work period of 13 days. Alternatively, the City asserts that roll call preparation for sergeants and lieutenants does not constitute compensable work. As a second alternative argument, the City asserts that even assuming sergeants and lieutenants are entitled to compensation for their meal periods, and assuming further that the plaintiffs' roll call preparation is compensable, the plaintiffs in Count II still do not work enough hours to entitle them to overtime compensation under § 207(k).

Count III includes the claims of all active Commanders. The Commanders seek two forms of relief. First, they seek to have their compensatory time re-computed and awarded on a time-and-one-half basis for all compensatory time accrued in excess of 480 hours since 1986. They also seek to have all the FLSA overtime they actually worked recalculated to include the relief applicable to them pursuant to Counts I and II. They seek to have such overtime recalculated on a time-and-a-half basis before determining the number of hours accrued in excess of 480 hours. In Count IV, retired Commanders seek the same relief as that sought by the active Commanders in Count III. In response, the City argues that Commanders are "executive employees," who are exempt from the FLSA's overtime provisions pursuant to § 213(a). Alternatively, the City argues that the retired Commanders have already accepted a monetary payout for their accrued compensatory time at retirement, and that accordingly, no further amount is may be recovered.

## III. PROCEDURAL BACKGROUND

The parties conducted extensive discovery in this matter. Pursuant to this Court's Scheduling Order, the parties submitted a Stipulation of Uncontested Facts as to the liability issues (hereinafter "Stip."). The City also filed a Statement of Contested Facts, indicating the areas of disagreement between the parties. The plaintiffs and the City have now filed their cross-motions for summary judgment on the liability issues.

## IV. DISCUSSION

### A. The Standard for Summary Judgment

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). When considering a motion for summary judgment, this Court shall grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, this Court will resolve all reasonable doubts and inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The inquiry into whether a "genuine issue" of material fact exists has been defined by the Supreme Court as whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.*

The Supreme Court articulated the allocation of burdens between a moving and non-moving party in a motion for summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court held that where the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant has the initial burden of showing the court the absence of a genuine issue of material fact, but that this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Id.* at 323, 106 S.Ct. at 2552–53. The nonmovant must then direct the court to record evidence demonstrating the existence of a genuine issue of material fact. The Supreme Court further elaborated on the type of evidence that the nonmoving party must adduce to withstand a motion for summary judgment:

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred [a genuine issue of material fact].

*Id.*

■ In contrast, where "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." *National State Bank v. Federal Reserve Bank,* 979 F.2d 1579, 1582 (3d Cir.1992). To sustain its burden under such circumstances, the movant must make an affirmative showing that it is entitled to summary judgment. *See id.; Resolution Trust Corp. v. Gill,* 960 F.2d 336, 341 (3d Cir.1992).

## B. *The Statutory Framework*

■ In 1985, the Supreme Court overruled its prior decision in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), and held that the FLSA applies to the states and their political subdivisions. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). After *Garcia,* cities were potentially liable for violations of the FLSA's overtime pay requirements, whereas, in the nine years between *National League of Cities* and *Garcia,* there was no potential liability. Providing states and their subdivisions with an opportunity to conform their pay practices to the strictures of the FLSA, Congress passed an amendment delaying the application of the FLSA to the states until April 15, 1986. Federal Labor Standards Act Amendments of 1985, Pub.L. No. 99–150, § 2(c), 1985 U.S.Code Cong. & Admin. News (99 Stat.) 737, 788. The FLSA is now fully applicable to municipalities and thus is available to redress the claims of law enforcement personnel, such as the plaintiffs in the present case. *See, e.g., Birdwell v. City of Gadsden, Ala.,* 970 F.2d 802, 804 (11th Cir.1992).

■ The heart of the FLSA is its mandate that covered employers must pay employees overtime for hours worked in excess of forty hours per week. Specifically, section 7(a) provides that:

> [e]xcept as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Thus, as a general matter, overtime hours for a workweek begin after an employee has worked forty hours in such workweek. *See id.; Birdwell,* 970 F.2d at 804; *Wethington v. City of Montgomery,* 935 F.2d 222, 224 (11th Cir.1991). An employee's right to receive overtime compensa-

tion after working forty hours in a workweek is an important right, and, indeed, is one which a labor union cannot agree to waive on behalf of its members. *See Barrentine v. Arkansas–Best Freight Sys.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981).

### C. *The Section 7(k) Exception*

■ The City argues that it is not subject to Section 7(a)'s forty-hour workweek requirement because of the applicability of an exception to the general rule applicable to law enforcement personnel. The exception, contained in Section 7(k), reflects Congress' recognition "that certain jobs are not easily susceptible to the workweek method of wage and time calculations." *Wethington v. City of Montgomery*, 935 F.2d 222, 224 (11th Cir. 1991).

Section 7(k) provides in relevant part as follows:

No public agency shall be deemed to have violated subsection (a) of this section with respect to the employment of any employee in ... law enforcement activities ... if ...

(2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period, the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 ... bears to 28 days, compensation of a rate not less than one and one-half the regular rate at which he is employed.

29 U.S.C. § 207(k). Thus, "if the City adopted a work period of between 7 and 28 consecutive days, then the City is entitled to require its employees to work more hours without overtime pay." *Birdwell*, 970 F.2d at 804. The City bears the burden of proving, by a preponderance of the evidence, that it has adopted a 7(k) work period. *Lamon v. City of Shawnee, Kan.*, 972 F.2d 1145, 1153–54 (10th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993); *cf. Birdwell*, 970 F.2d at 805 (holding that City bears burden of proving adoption of 7(k) work period by "clear and affirmative evidence," but relying upon Tenth Circuit decision in *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 (10th Cir.1984), which was implicitly overruled by *Lamon*).

■ The starting point in analyzing the 7(k) exception is the language of the Department of Labor's ("DOL") regulations interpreting Section 7(k). Indeed, as a general matter, "the DOL's interpretative regulations" under the FLSA "constitute a body of experience and informed judgment to which courts ... may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Under § 553.224 of the applicable regulations, the term "work period" is defined as:

(a) [A]ny *established* and *regularly recurring* period of work which, under the terms of the Act and legislative history, cannot be less than 7 consecutive days nor more than 28 consecutive days. Except for this limitation, the work period can be of any length and it need not coincide with the duty cycle or pay period or with a particular day of the week or hour of the day. Once the beginning and ending time of an employee's work period is established, however, it remains fixed regardless of how many hours are worked within the period. The beginning and ending of the work period may be changed, provided that the change is intended to be permanent and is not designed to evade the overtime compensation requirements of the Act.

(b) An employer may have one work period applicable to all employees, or different work periods for different employees or groups of employees.

29 C.F.R. § 553.224. Thus, there is a two-part test under § 553.224. *See id.; Lamon*, 972 F.2d at 1145 (relying upon § 553.224); *Birdwell*, 970 F.2d at 806 (same); *Nixon v. City of Junction City, Kan.*, 707 F.Supp. 473, 479 (D.Kan.1988) (concluding that "the term 'work period' means 'any established and regularly recurring period of work.'") (*quoting* 29 C.F.R. § 553.224(a) (1987)). First, the City must prove that it has "established" a 7(k) work period. Second, it must prove that such period is "regularly recurring."

The City, of course, argues that it established the Flex Schedule and that the work

cycle established by the Flex Schedule is regularly recurring. Accordingly, in the City's view, it is entitled to benefit from the 7(k) exception. If the City is correct in asserting that it adopted a thirteen day work period under Section 7(k), then it would only be required to pay overtime when its employees work in excess of 79 hours within a 13–day work period. *See* 29 C.F.R. § 553.230 (establishing maximum standard hours for 7(k) work periods of at least 7 but not more than 28 days). The plaintiffs assert that the City has failed to prove that it meets either element of the test.

## 1. Did the City "Establish" the Flex Schedule?

Although the Third Circuit has not yet spoken on the issue of how a 7(k) work period may be established, several other appeal courts have addressed the issue. The Eleventh Circuit did so in *Birdwell*. The plaintiffs-appellees in *Birdwell* were members of the police department in the City of Gadsden, Alabama. They claimed that they were required to work an eight hour and fifteen minutes shift per day, five days per week, but were only paid for forty hours per week, in violation of the FLSA's forty hour workweek requirement. The jury found that the officers were required to attend a fifteen-minute roll call each day they were on duty and that they were not paid at the rate of time and a half for the 1.25 hours per week attributable to the roll call meetings, which they were required to work in excess of forty hours.

As in the present case, the defendant claimed that because it had adopted a 7(k) work period, it was exempt from 207(a)'s forty hour workweek requirement. The collective bargaining agreement between the parties provided for a forty hour workweek. Further, there was uncontradicted evidence that the officers worked in seven-day cycles. Within the seven-day cycle, an officer worked five days with two days off. The City varied the days the officer could take off, but the seven-day cycle remained fixed.

Notwithstanding the foregoing evidence, which was uncontradicted, the district court held, as a matter of law, that the City of Gadsden had not adopted a 7(k) work period. In reaching its holding the district court reasoned that because the plaintiffs did not work seven consecutive days, Section 7(k) was inapplicable. After the jury rendered its verdict, the City appealed, contending, *inter alia*, that the district court erred by directing a verdict for the plaintiffs on the 7(k) issue. On appeal, the Eleventh Circuit agreed with the City and remanded the case, ordering the district court to provide the plaintiffs with an opportunity to present evidence rebutting the City's evidence on the 7(k) issue.

According to the Eleventh Circuit, the proper focus is neither on contractual language nor on the pay period actually utilized by the City. Rather, the question is whether the plaintiffs *actually worked* cycles of between seven and twenty-eight days. *Id.; see also Nixon*, 707 F.Supp. at 479 ("An *established* work period is a keystone to the Section 207(k) exclusion."). The fact that the collective bargaining agreement provided for the payment of overtime after an employee worked forty hours per week was not dispositive. *Birdwell*, 970 F.2d at 805–06. In other words, "the City may have been in breach of contract while not in violation of the FLSA." *Id.* at 805. The *Birdwell* court held that if the plaintiffs produced no evidence to rebut the uncontradicted evidence of record that the officers worked in regularly recurring seven day cycles and that the collective bargaining agreement similarly provided for a seven day work week, a directed verdict would be proper. *Id.*

The Tenth Circuit also has delineated the nature of an employer's burden when it seeks to prove its entitlement to the 7(k) exception. The plaintiffs-appellants in *Lamon* were police officers and sergeants of the City of Shawnee Police Department. They alleged that the City violated the FLSA by failing to pay them for meal periods occurring during work shifts and by failing to compensate those plaintiffs working as supervisors for the time worked preparing for the daily shift briefings. The jury rendered its verdict in favor the plaintiffs on the mealtime issue and in favor of the defendant on the issue of time spent preparing for briefings. However, the jury also found that the City had availed

itself of a twenty-eight day Section 7(k) work period. Because the plaintiffs did not work in excess of 171 hours, the maximum number of hours for which employees could be paid at their regular rate of pay under a twenty-eight day 7(k) period, the court held that they were not entitled to overtime pay.

On appeal, the plaintiffs argued that there was insufficient evidence to support a finding that the City had established a twenty eight day work period. In support of their position that they had indeed "established" a 7(k) work period, the City produced evidence establishing that it "adopted Administrative Code No. 2–5," which set forth its 207(k) employment policy. *Lamon*, 972 F.2d at 1152. The plaintiffs argued that notwithstanding the promulgation of Administrative Code No. 2–5, the City's compensation and scheduling practices under the new regime did not change. In particular, they argued, the City continued to calculate and pay overtime, as before, based upon a forty hour work week. Rejecting the plaintiff's arguments, the Court held "[t]he evidence that Defendant adopted Administrative Code No. 2–5 was uncontested. By adopting the measure, the City took the necessary and sufficient step to establish a subsection (k) regime." *Id.* at 1154.

A number of important general principles can be culled from the appellate decisions addressing the first prong of the test under Section 7(k) and the regulations promulgated thereunder. Clearly, the work period does not have to coincide with the pay period or with a particular day of the week. 29 C.F.R. § 553.230(c); *Birdwell*, 970 F.2d at 806. Moreover, the fact that a contract between the parties sets forth a different pay period or compensation schedule than the 7(k) work period is not dispositive. *Birdwell*, 970 F.2d at 806. The "establishment" of a 7(k) work period may be manifested by an appropriate public declaration of intent to adopt a work period of between 7 and 28 days. *See Lamon*, 972 F.2d at 1154 (stating that work period is adopted where specific schedule is "put into effective operations" by employer). Alternatively, a public employer may establish a 7(k) work period even without making a public declaration, as long as its

employees actually work a regularly recurring cycle of between 7 and 28 days. *See Birdwell*, 970 F.2d at 806 (holding that work period of seven days could be established by uncontradicted evidence that employees worked regular seven day cycles). It is clear that, whether or not a public declaration is made, a 7(k) work period cannot be established unless the employees actually work the rotation of days contemplated in the work period adopted by the municipality. *See id.; see also Lamon*, 972 F.2d at 1152 (recognizing that an employer may not impose sham changes in its employment scheduling and compensation policies so as to evade the Act).

There is evidence of record to support the City's position that it established the Flex Schedule as a thirteen-day Section 7(k) work period. The Flex Schedule was first adopted as a result of the Arbitration Award. The City implemented the Flex Schedule for the first time on January 8, 1990. Since that time, the Flex Schedule has been utilized for each of the last five calendar years and continues to be utilized at present. The plaintiffs admit that they actually work the schedule of days set forth in the Flex Schedule. Thus, there is evidence that most of the plaintiffs do actually work a 13 day cycle.

Moreover, as in *Lamon*, the City took affirmative steps to announce the adoption of the Flex Schedule. The City announced the establishment of the Flex Schedule when it was first adopted. The City announced the Flex Schedule through an Informational Memorandum from then-Police Commissioner Willie Williams to all police personnel on November 20, 1989. In the Commissioner's Memorandum, the Commissioner announced the adoption of a new schedule and described the 13 day rotation—"generally, four days worked and two days off, followed by five days worked and two days off."

The FOP also recognized the implementation of the Flex Schedule. In an FOP News Bulletin, the FOP announced the adoption of the Flex Schedule on November 22, 1989. In recognition of the regular 4–2, 5–2 rotation, the FOP informed its members that the new schedule included a "4 or 5 Work Days Per Week".

The plaintiffs have confirmed that they received both the Commissioner's Memorandum and the FOP News Bulletin. In addition, each year, the plaintiffs received copies of that year's Flex Schedule and have confirmed that they worked the rotation of days included in those schedules.

Thus, when initially implemented, both the City and the FOP recognized the adoption of the Flex Schedule with its 4–2, 5–2 rotation. Moreover, this same Flex Schedule has been actually worked by the plaintiffs for the last five calendar years. Accordingly, the City argues, there is no genuine issue of material fact as to whether the City "established" a 7(k) work period by virtue of its adoption and implementation of the Flex Schedule.

The plaintiffs raise three arguments in support of their contention that the City has failed to sustain its burden of proving, as a matter of law, that it established a 7(k) work period. Specifically, the plaintiffs rely on the fact that the applicable collective bargaining agreement calls for a forty hour workweek, that the City never made an official pronouncement that it was adopting a 7(k) work period and that it has failed to comply with certain record keeping requirements mandated by the regulations applicable to 7(k) employers. In the plaintiffs' view, the City's failure to adduce evidence on any and all of these three points entitles them to summary judgment on the issue of whether the City is entitled to benefit from Section 7(k), or, at the very least, negates the City's entitlement to summary judgment. The Court will address the plaintiffs' arguments in turn.

First, the fact that the collective bargaining agreement conflicts with the FLSA work period is not dispositive. Under the 1990 CBA, the work week is described as "forty (40) hours, Monday through Sunday, inclusive." Further, the City continues to record and pay overtime based on the forty hour workweek established by the 1990 CBA. The plaintiffs in *Lamon* and *Birdwell,* like the plaintiffs herein, argued that the defendant could not have adopted a 7(k) work period in light of the terms of the relevant collective bargaining agreements, which provided for overtime compensation when an employee worked in excess of forty hours per week. In *Lamon,* the compensation and scheduling practices under the new [7(k)] regime did not change from those utilized under the collective bargaining agreement between the parties. Nevertheless, the court held,

> [t]here is no basis for concluding that, once an employer has opted for the subsection (k) framework, the employer may only pay overtime for hours worked beyond the legal maximum permitted by § 553.224(a). The City chose to continue paying overtime starting at a lower threshold, a state of affairs which inured to the plaintiffs' benefit and which was the City's prerogative to devise.

*Lamon,* 972 F.2d at 1154; *see also Birdwell,* 970 F.2d at 806 (holding that although contract is probative on the issue of whether the City established a 7(k) work period, it is not dispositive because "parties cannot contract out of the Act"). The *Lamon* court went on to hold that there was sufficient evidence to support the jury's finding that the City established a subsection (k) regime because, even though it continued to pay its employees for overtime worked in excess of forty hours per week, "[t]he evidence that Defendant adopted Administrative Code No. 2–5 was uncontested." *Lamon,* 972 F.2d at 1154. The court reasoned that "[b]y adopting the measure, the City took the necessary and sufficient step to establish a subsection (k) regime." *Id.* Thus, the plaintiffs are not entitled to summary judgment merely because the applicable CBA contemplates a work week that differs from the purported 7(k) work period.

Second, the plaintiffs point to the City's failure to comply with certain record keeping requirements imposed by the regulations. More specifically, the plaintiffs argue that the City's failure to comply with 29 C.F.R. § 553.51 dooms its argument that it established a 7(k) work period. Section 553.51 imposes a duty upon 7(k) employers to make notations on the payroll records for each employee indicating, *inter alia* the length of the work period and its starting time. 29 C.F.R. § 553.51. The City admits that "[w]hen the Flex Schedule became effective, the defendant did not note on the pay

records of the employees that they were subject to a 13 day work period under FLSA [or] note on the pay records of each employee, or group of employees, the beginning and ending of a specified 13 day work period." (Stip., ¶ 13).

The plaintiffs argue that DOL regulations provide the minimum records required to be kept in order to qualify for a § 207(k) exemption and notes that in many instances employers have gone to great lengths to conform their timekeeping and payroll practices to the regulations. Although the plaintiffs are correct insofar as they assert that some employers have gone to great lengths to comply with § 553.51, they have not cited any caselaw supporting their argument that a 7(k) work period cannot be established unless the proper records are kept. Indeed, the caselaw on this point reveals that it is not the records kept, but the cycle of days actually worked that is controlling. *See Lamon,* 972 F.2d at 1154; *Birdwell,* 970 F.2d at 806.

This conclusion is buttressed by the structure of the DOL regulations. Significantly, § 553.51 is in a sub-section entitled "Recordkeeping", and is separated—both logically and in terms of positioning—from the sections of the Code of Federal Regulations addressing the requirements for the adoption of a 7(k) work period. The fact that the City does not keep adequate records may well be relevant to the issue of which party bears the burden of proof on damages, if and when it is established that the FLSA was violated, but it is not dispositive of whether the City has exercised its option to establish a 7(k) work period.

Finally, the plaintiffs argue that they are entitled to a finding that the City did not establish a 7(k) work period because the City never made an official announcement that it was "adopting a 13 day work period pursuant to 29 U.S.C. § 207(k) of the Fair Labor Standards Act." However, as the City correctly observes there is no authority for the proposition that the incantation of such "magic words" is required in order to create a 7(k) work period. Indeed, there is persuasive caselaw to the contrary. *See Birdwell,* 970 F.2d at 806 (standing for proposition that

relevant focus is on actual cycle of days worked).

Further, even assuming that an official statement adopting a work period is required, there is evidence of such a statement in the record. Specifically, there is the Commissioner's Memorandum, which informed the plaintiffs that the Police Department was adopting the Flex Schedule. Even though the Memorandum does not explicitly refer to a "work period" or to 7(k), in contrast to the declaration at issue in *Lamon,* a reasonable trier of fact could, nevertheless, conclude that the City adopted a 13 day work period by virtue of its circulation of the Commissioner's Memorandum.

Thus, the question is whether, given the current state of the record, summary judgment is appropriate on the 7(k) issue. In *Lamon,* the court held that "[w]hether the employer has proved that he has adopted a 7(k) work period is a question for the jury." *Lamon,* 972 F.2d at 805 (*citing Lamon v. City of Shawnee,* 754 F.Supp. 1518 (D.Kan. 1991)); *see also Nixon,* 707 F.Supp. at 479 (holding that existence of credibility issue precludes summary judgment on 7(k) issue). On the other hand, a certain set of facts, if undisputed, may support only one inference with respect to whether an employer adopted a 7(k) work period. *See Birdwell,* 970 F.2d at 806. Under such circumstances, it would be appropriate for the court to decide the 7(k) issue by way of summary judgment. *Id.* at 806 n. 2.

The City relies on *Birdwell* for its argument that summary judgment is appropriate. In *Birdwell,* the court found as follows:

[t]he evidence was uncontroverted that the officers worked in seven day cycles—an officer worked five days with two days off. The city would vary which days the officer could take off, but the seven day cycle was kept. In addition, the contract called for a seven day week.

*Id.* at 806. The court concluded that "[w]ith no evidence to contradict this, a directed verdict [or summary judgment] in the defendant's favor would be proper." *Id.* at 806 & n. 2.

In *Lamon*, by contrast, the 7(k) issue was sufficiently unclear so as to warrant its submission to the jury for resolution. The collective bargaining agreement between the parties in *Lamon* provided for overtime to be paid for time worked in excess of 40 hours per week and, in fact, the City's practice was to pay overtime for time worked in excess of forty hours per week or 160 hours per 28 days. *Lamon*, 972 F.2d at 1148; *see also Lamon v. City of Shawnee, Kansas*, C.A. No. 88–4200–S, 1990 W.L. 186280, at 8 n. 2 (D.Kan. Oct. 4, 1990). In anticipation of the applicability of Section 7(k), the City adopted an amendment to its administrative code, which expressly stated that the City was adopting a twenty eight day work period "pursuant to Section 207(k) of the Fair Labor Standards Act". 1990 W.L. 186280, at 8 n. 1. If the defendant had adopted a 7(k) work period of 28 days, as they alleged, then they would not have to pay overtime until its employees worked in excess of 171 hours. *See id.*; 29 C.F.R. § 553.230(c). Although the contract was not dispositive of the 7(k) issue, the fact that the minimum threshold for overtime payments under the contract differed from that under the FLSA, raised a sufficient issue of material fact to warrant submission of the issue to the jury. *See Lamon*, 1990 W.L. at 186280, at 8 n. 2.

Similarly, in *Nixon*, the court considered an employer's argument that it had established a 7(k) work period and was, therefore, exempt from Section 7(a). However, the defendant's employee manual referred to a forty hour "work week" and made no reference to a 14–day work period. Accordingly, the court held that there was a genuine issue of material fact, which prevented the court from deciding the 7(k) issue on summary judgment. *Nixon*, 707 F.Supp. at 479.

After reviewing the summary judgment record, the Court finds that there remains genuine issues of material fact, precluding the entry of summary judgment. Specifically, the fact that the threshold for paying overtime under the collective bargaining agreement differs from that applicable to

a 7(k) work period of 13 days, although not dispositive, could support an inference that the City did not establish a 7(k) work period. *See Lamon*, 1990 W.L. 186280, at *9 n. 2; *Nixon*, 707 F.Supp. at 479. Also, the Commissioner's Memorandum refers to a 13 day cycle, but it does not actually use the phrase "work period." Again, although this is by no means dispositive, it is evidence from which a reasonable factfinder could infer that the City did not establish a 7(k) work period of 13 days. In light of the foregoing, the Court holds that the issue of whether the City adopted a 7(k) work period cannot be resolved by way of summary judgment.[1]

### D. Whether the Plaintiffs' Meal Periods Constitute Compensable "Work?"

The plaintiffs are assigned a regular shift under the Flex Schedule of 8.25 hours. Their claims for overtime under the FLSA are based on their contention that they *work* 8.25 hours per day (Count I) and 8.50 hours per day (Count II) without receiving overtime, allegedly resulting in a violation of the FLSA requirement that employees receive overtime "for a workweek longer than 40 hours." 29 U.S.C. § 207(a)(1). According to the City, the plaintiffs receive a 30 minute paid meal period during each shift. The City argues that the meal period does not constitute "work" within the meaning of the FLSA. The plaintiffs, by contrast, argue that the meal period does constitute compensable "work" and that in any event, they are rarely given the opportunity to take a meal period.

The FLSA itself does not define the term "work." However, the United States Supreme Court has defined "work" to mean "physical or mental exertion controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal, Iron & Railroad v. Muscoda Local No. 123*, 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944). In two companion cases, the Supreme Court refined the *Tennessee Coal* standard, holding that the question under the FLSA is whether the employee's time is

---

1. Because the Court has found that there is a genuine issue of material facts as to whether the City established 7(k) work period, it need not, at this juncture, reach the question of whether any such work period was regularly recurring.

spent "predominantly" for the employer's benefit or for the employee's benefit. *See Armour & Co. v. Wantock*, 323 U.S. 126, 134, 65 S.Ct. 165, 169, 89 L.Ed. 118 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124. The Court also stated that lower courts should adopt a practical approach based on the realities of each case in determining whether employees were spending certain periods of time predominantly for the benefit of the employer or for their own benefit. *See Armour*, 323 U.S. at 133, 65 S.Ct. at 168; *Skidmore*, 323 U.S. at 136–37, 65 S.Ct. at 162–63.

Notwithstanding the Supreme Court's longstanding definition of the term "work," the plaintiffs argue that they are entitled to be compensated for their meal periods unless they were "completely relieved of duty" during such periods. The plaintiffs' argument is grounded in two regulations promulgated by DOL, which exclude bona fide meal periods from worktime and define bona fide meal periods to be periods in which the employee is "completely relieved from duty for the purposes of eating regular meals." 29 C.F.R. § 785.19(a); 29 C.F.R. § 553.223(b). More specifically, § 785.19(a) provides as follows:

(a) Bona fide meal periods. Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for purposes of eating regular meals.... The employee is not relieved if he is required to perform any duties, whether active or inactive while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine while eating.

29 C.F.R. § 785.19(a). Similarly, § 553.223(b), which applies to Section 7(k) employers, provides that meal time may be excluded from hours worked on tours of duty of less than 24 hours

provided that the employee is completely relieved from duty during the meal period, and all the other tests in § 785.19 of this title are met. On the other hand, where law enforcement personnel are required to remain on call in barracks or similar quarters, or are engaged in extended surveillance activities (e.g., "stakeouts"), they are not considered to be completely relieved from duty, and any such meal periods would be compensable.

29 C.F.R. § 553.223(b).

The Third Circuit has not yet articulated the standard to be used in determining whether meal time is compensable under the FLSA. However, all of the courts of appeals that have addressed the issue have held that the appropriate test in determining the compensability of meals for Section 7(k) employees is the Supreme Court's "predominantly for the benefit of the employer" standard. *See, e.g., Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1346 & n. 7 (11th Cir.1994); *Henson v. Pulaski County Sheriff Dept.*, 6 F.3d 531, 534 (8th Cir.1993); *Alexander v. City of Chicago*, 994 F.2d 333, 337 (7th Cir.1993); *Armitage v. City of Emporia, Kan.*, 982 F.2d 430, 432 (10th Cir.1992); *Lamon*, 972 F.2d at 1155; *Lee v. Coahoma County, Miss.*, 937 F.2d 220, 225 (5th Cir.1991). Most of these courts have merely interpreted the regulations as providing for the predominant benefit test. *See, e.g., Avery*, 24 F.3d at 1347 n. 7; *Alexander*, 994 F.2d at 337; *Lamon*, 972 F.2d at 1157. The Eighth Circuit employed a different rationale, the court reasoned that the regulations were inconsistent with longstanding Supreme Court precedent and, therefore, lacked persuasive force. *See Henson*, 6 F.3d at 534–35. The Fifth Circuit adopted a slightly different approach, reasoning that because the facts in its case did not resemble those in either of the examples stated in § 553.23(b), the meal breaks were not compensable. *Lee*, 937 F.2d at 225.

Similarly, courts have applied the predominant benefit test in the context of non–7(k) employees. *See, e.g., Hill v. United States*, 751 F.2d 810, 814 (6th Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). For example, in *Hill*, the Sixth Circuit found, as a matter of law, that postal workers did not spend their meal times "predominantly for the benefit" of the Postal Service and therefore were not entitled to be compensated for that time. *Id.* Other courts have adhered to a formalistic approach, holding that, under the express lan-

guage of § 785.19, meal time is not to be excluded unless employees are "completely relieved of duty." *See, e.g., Kohlheim v. Glynn County, Ga.,* 915 F.2d 1473, 1477 (11th Cir.1990) (applying "completely relieved of duty" test to firefighters claims for meal period compensation); *Donovan v. Bel-Loc Diner, Inc.,* 780 F.2d 1113, 1115 n. 1 (4th Cir.1985) (applying "completely relieved of duty" test to waitresses' claims for meal period compensation).

■ The Court is persuaded that the "predominant benefit" test is the better reasoned approach regardless of whether the City is ultimately found to be a 7(k) employer. As the Seventh Circuit observed in *Alexander,*

"Section 207(k) obviously is intended to address the unique employment circumstances of a law enforcement officer.... Presumably, the same circumstances justify taking the same approach to meal period times for those similarly employed whether covered by § 207(k) or not."

994 F.2d at 337 (*quoting Brinkman v. Department of Corrections,* 804 F.Supp. 163, 171 (D.Kan.1992), *aff'd* 21 F.3d 370 (10th Cir.1994), *petition for cert. filed,* 63 USLW 3064 (July 1, 1994)). Indeed, any approach other than the "predominant benefit" test would conflict with longstanding Supreme Court precedent admonishing lower courts to "use a practical, realistic approach under the unique circumstances of each case when deciding whether certain activities constitute work." *Henson,* 6 F.3d at 534 (*citing Skidmore,* 323 U.S. at 140, 65 S.Ct. at 164; *Armour,* 323 U.S. at 133, 65 S.Ct. at 168). Further, in cases such as this one, involving an employer in the public domain, the general public should not be forced to pay city employees for time spent not working. 57 Fed. Reg. 37,667 (recognizing that local governments must remain accountable to the public with respect to their pay practices).

The Court believes that the "predominant benefit" standard adequately harmonizes these concerns. Therefore, the Court adopts the approach of the majority of courts and holds that in the case of law enforcement personnel, the DOL regulations should be read as requiring compensation only if meal periods are spent primarily for the employer's benefit.

Next, the Court turns to the question of whether summary judgment is appropriate on the meal period issue. The plaintiffs rely on the District of Kansas' decision in *Wahl v. City of Wichita, Kan.,* 725 F.Supp. 1133 (D.Kan.1989), for its argument that summary judgment is appropriate. In *Wahl,* the law enforcement officers were subject to geographical limitations, were required to answer emergency calls and respond to crimes and citizen inquiries, and were restricted both in what they could read and in the personal activities or errands they could perform. *Id.* at 1136–37. Applying the "completely relieved of duty" standard, the court held that the plaintiffs were entitled to summary judgment. *Id.* at 1144.

For reasons that should be apparent, *Wahl* is not persuasive. First, *Wahl* did not involve a 7(k) employer. To the extent that the plaintiffs believe *Wahl* to be persuasive in the context of a 7(k) employer, they are mistaken because, subsequent to the *Wahl* decision, the Tenth Circuit held that the predominant benefit test applies in the context of a 7(k) employer. *See Armitage,* 982 F.2d at 432. Moreover, in contrast to the *Wahl* court, this Court has held that the predominant benefit test applies even in the context of a non–7(k) employer of law enforcement personnel. Correspondingly, the question remaining is whether either party is entitled to summary judgment under the predominant benefit standard.

■ There are genuine issues of material fact precluding the entry of summary judgment. The City has produced unrebutted evidence that officers enjoy wide discretion in determining how to spend their meal periods. Specifically, once the meal period is cleared by the radio dispatcher, each plaintiff is taken out of the regular radio rotation. The plaintiffs may then eat anywhere in their sector during the meal period, or, they can obtain permission to eat outside the sector. Higher ranking plaintiffs may eat anywhere in their district, or anywhere in the entire City.

Further, while on their meal period, plaintiffs are permitted to read. They are allowed to run certain personal errands within their sector, such as picking up prescriptions or going to the bank or post office. They may also make personal telephone calls and meet and converse with other police officers.

On the other hand, there is record evidence of certain restrictions imposed on the plaintiffs' activities during their meal periods. First, they must remain in uniform and they may not drink alcohol or sleep. Further, they must respond to civilian, "on-the-spot" requests for assistance and must respond to emergency calls, although, if the requests occupy more than a few minutes or the officer is responding to an emergency call, the officer logs back in as "on-duty". The City concedes that the foregoing restrictions are, in fact, imposed. (City's Mem. of Law at 15–16). Most importantly, however, is that the plaintiffs have produced evidence which, if believed, supports the inference that they do not customarily receive a meal period at all, or they receive a meal period of substantially shorter duration than thirty minutes. (Plaintiffs' Reply Brief at 7–12 (citing deposition and affidavit testimony)). Accordingly, the Court finds that there are material factual issues remaining, which cannot be resolved by way of summary judgment. The determination of whether the thirty-minute meal periods are compensable must await trial.

### E. Whether Sergeants' and Lieutenants' Roll Call Preparation Constitutes Compensable "Work?"

In Count II of the Complaint, the plaintiffs allege that the City has violated the FLSA overtime provisions by failing to compensate certain sergeants and lieutenants who routinely come to work fifteen minutes early in order to prepare roll call for the officers coming on duty for that shift. The City argues that there is a genuine issue of material fact on the issue of whether the plaintiffs' roll call activities constitute compensable "work," and that, accordingly, summary judgment is inappropriate. It is the plaintiffs' burden to establish that a given

activity constitutes work. *See McIntyre v. Division of Youth Rehabilitation Servs.,* 795 F.Supp. 668, 673 (D.Del.1992).

The Portal–to–Portal Act of 1947 provides in relevant part that an employer need not compensate its employees for activities that are "preliminary to or postliminary to" the "principal activity or activities" that an employee is engaged to perform, unless the employer is otherwise required to compensate its employees for such work by custom, contract or practice.[2] 29 U.S.C. § 254(a)(2). The term "principal activity or activities" includes all activities that are "integral and indispensable" to the principal activity. *Steiner v. Mitchell,* 350 U.S. 247, 253, 76 S.Ct. 330, 334, 100 L.Ed. 267 (1956); *Brusstar v. Southeastern Pennsylvania Transportation Auth.,* 636 F.Supp. 1557, 1558 (E.D.Pa.1986). To determine whether an activity is "integral and indispensable" to the principal activity, the court must inquire into " 'whether [the activities] are performed as part of the regular work of the employees in the ordinary course of business.' " *Truslow v. Spotsylvania County Sheriff,* 783 F.Supp. 274, 277 (E.D.Va.1992) (*quoting Dunlop v. City Elec., Inc.,* 527 F.2d 394, 401 (5th Cir.1976)).

There is a genuine issue of material fact precluding the entry of summary judgment on the sergeants' and lieutenants' pre-shift roll call claims. The plaintiffs have directed the Court to evidence that sergeants and lieutenants do "occasionally" arrive prior to roll call to prepare and be ready to conduct roll call at the beginning of the shift. (Golden Dep., Plaintiff's App. Tab A, at p. 62). This alone is insufficient to establish that pre-shift roll call preparation was "integral and indispensable" to sergeants' and lieutenants' principal activities. Further, the Court cannot determine what sergeants' and lieutenants' *principal* activity was from the evidence adduced by the plaintiffs. Accordingly, the Court cannot make any determination as to the relationship between roll call activities and sergeants' and lieutenants' other duties, let alone a determination that

---

**2.** The plaintiffs have not directed the Court to any custom, contract or practice requiring the

City to compensate sergeants and lieutenants for preparing roll call.

there was an "integral and indispensable" relationship between the two.

Moreover, there is evidence in the record that the plaintiffs are responsible for reporting their "time in" and "time out" to personnel in the operations room, who then prepare a Daily Attendance Report ("DAR"). (Murphy Dep., pp. 11–12, Defendant's Appendix Vol. I, Ex. C). Plaintiffs, usually lieutenants, sign off attesting to the accuracy of records demonstrating the amount of time they spend engaging in pre-shift activities. (*Id.* at 12); O'Donnell Dep. at 14 (Vol. II, Ex. P); Ryan Dep. at 38–39 (Vol. I, Ex. D). The City has produced evidence that the plaintiffs' attendance records do not reflect the alleged pre-shift activities for which they seek to recover in Count II. (Defendant's Response to Plaintiffs' Motion for Summary Judgment at 8 & n. 11 (citing deposition testimony)). After reviewing the evidence currently in the record and identified by the parties, the Court holds that a reasonable trier of fact could find that the alleged pre-shift activities are not an "integral and indispensable" part of sergeant and lieutenant plaintiffs' principal activity. Accordingly, the plaintiffs' motion for summary judgment on the issue of pre-shift roll call preparation is denied.

### F. Whether Commanders at the Rank of Captain and Above are "Executive Employees" Under Section 213(a)?

Counts III and IV pertain to officials in the rank of Captain, Staff Inspector, Inspector and Chief Inspector. More specifically, in Count III, the plaintiffs allege that the City has violated § 207(o)(1)[3] and § 207(o)(3)(A)[4] by failing to award active Commanders compensatory time on a time and one-half basis and by failing to pay active Commanders for all compensatory time earned in excess of 480 hours. In Count IV, retired Commanders allege that the City has violated § 207(o)(4)[5] of the FLSA by failing to pay them for all compensatory time earned in excess of 480 hours at the time of their retirement.

■■■■ The City maintains that these officials are exempt executive employees pursuant to 29 U.S.C. § 213(a)(1). It is the City's burden to establish that the executive employee exemption applies to its employees. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Brock v. Claridge Hotel & Casino,* 846 F.2d 180, 183 (3d Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 307, 102 L.Ed.2d 326 (1988). Moreover, exemptions under § 213(a) are to be narrowly construed in order to further Congress' intent to provide broad federal protection for employees. *Mitchell v. Lubin, McGaughy & Assocs.,* 358 U.S. 207, 211, 79 S.Ct. 260, 263–64, 3 L.Ed.2d 243 (1959); *Guthrie v. Lady Jane Collieries, Inc.,* 722 F.2d 1141, 1143 (3d Cir.1983). The City must demonstrate that its employees fit "plainly and unmistakably within [the exemption's] terms." *Arnold v. Ben Kanowsky,*

---

**3.** Section 207(o)(1) provides:

Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive, in accordance with this subsection and in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this subsection.
29 U.S.C. § 207(o)(1).

**4.** Section 207(o)(3)(A) provides:

If the work of an employee for which compensatory time may be provided included work in a public safety activity, an emergency response activity, or a seasonal activity, the employee engaged in such work may accrue not more than 480 hours of compensatory time for hours worked after April 15, 1986. If such work was any other work, the employee may accrue not more than 240 hours of compensatory time for hours worked after April 15, 1986. Any such employee who, after April 15, 1986, has accrued 480 or 240 hours, as the case may be, of compensatory time off shall, for additional overtime hours worked, be paid overtime compensation.
29 U.S.C. § 207(o)(3)(A).

**5.** Section 207(o)(4) provides:

An employee who has accrued compensatory time off authorized to be provided under paragraph (1) shall upon termination of employment, be paid for the unused compensatory time at a rate of not less than—
(A) the average regular rate received by such employee during the last three years of the employee's employment, or
(B) the final regular rate received by such employee, whichever is higher.
29 U.S.C. § 207(o)(4).

*Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).

Section 213(a)(1) of the FLSA specifically provides that the FLSA requirements set forth in § 207 shall not apply to "employee[s] employed in a bona fide executive ... capacity." 29 U.S.C. § 213(a)(1). The regulations provide both a short test and a long test for determining whether an employee is employed in a bona fide executive capacity under § 213(a)(1). 29 C.F.R. § 541.1(f). The short test applies where an employee earns more than $250 per week. 29 C.F.R. § 541.1(f); *Shockley v. City of Newport News,* 997 F.2d 18, 25 (4th Cir.1993). The only evidence of record on the point suggests that all of the Commanders, even those at the rank of Captain, are paid an amount well in excess of $250 per week. (*See* Golden Aff., Defendant's Motion App. Vol. II, Ex. N ¶ 20; Ex. A). Therefore, the short test applies to the present case.[6]

Under the short test, an employee is considered an executive employee if the following conditions are met: (1) the employee is compensated on a salary basis; (2) his or her primary duty consists of managing the enterprise in which he or she is employed or a customarily recognized department or subdivision thereof; and (3) he or she regularly directs the work of two or more employees. 29 C.F.R. § 541.1(f); *Guthrie,* 722 F.2d at 1144. The first element of the definition has been described by the courts as the "salary basis test", whereas the second and third elements have been referred to as the "duties test". *See York v. City of Wichita Falls, Tex.,* 944 F.2d 236, 241–42 (5th Cir.1991). The City must satisfy both tests to benefit from the exemption.

**1. The Salary Basis Test**

Under the DOL regulations,

[a]n employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked.

29 C.F.R. § 541.118(a).

The plaintiffs argue that various practices and policies utilized by the City are inconsistent with the definition of a salaried employee under the DOL regulations and applicable caselaw. More specifically, they argue that the City's policy of utilizing partial day deductions, whereby a Commander is docked leave time or pay when he or she is sick, is inconsistent with the notion of a salaried employee. Further, they argue that the Commanders are subject to disciplinary requirements that are inconsistent with "executive" status. Finally, they argue, the City's policy and practice of granting compensatory time to Commanders who work overtime proves that the Commanders are hourly rather than salaried employees. The Court will address each of these arguments *seriatim.*

**a. Partial Day Deductions**

The impact of partial day deductions on a municipal employer's "executive employee" exemption argument has been widely litigated and has produced a divergence of views. Under § 541.118(a), an employee is paid on a salary basis if, *inter alia,* the employee is paid an amount which is "not subject to reduction because of variation in the quality or *quantity* of the work performed." 29 C.F.R. § 541.118(a). In general, salary status is not affected when deductions are made for absences of a day or more where the

---

6. It is uncontested that Commanders receive their annual salaries in equal bi-weekly payments. Captains, the lowest paid class of Commanders, receive a salary of between $48,042 and $52,424, depending on experience and other factors. Thus, the minimum amount that a plaintiff at the rank of Captain or above could possibly receive on a bi-weekly basis is $1,840.69, an amount which far exceeds the $250 per week minimum set forth in § 541.1(f). Additionally, both the plaintiffs and the defendant have argued in their respective briefs that the "short test" applies in the present case.

absence is due to sickness or was taken for personal reasons. *See* 29 C.F.R. § 541.118(a)(2) & (3); *Michigan Ass'n of Gov't Employees v. Michigan Dep't of Corrections,* 992 F.2d 82, 84 (6th Cir.1993). In contrast, the regulations do not provide an exception for absences of less than a day. As the Sixth Circuit observed, "courts have interpreted this silence to mean that pay deductions for absences of less than a day are inconsistent with salary status." *Michigan Ass'n of Gov't Employees,* 992 F.2d at 84; *see also Abshire v. County of Kern,* 908 F.2d 483 (9th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848 (1991); *Donovan v. Carls Drug Co., Inc.,* 703 F.2d 650, 652 (2d Cir.1983).

However, as noted, *supra,* there are strong public considerations militating against paying public employees for time not spent working. Reacting to these concerns, the DOL promulgated an interim rule, which provided that public employees who otherwise qualified as salaried employees and were exempt from the overtime provisions of the FLSA would not be disqualified solely because they are subject to partial day deductions. The interim rule was adopted on September 6, 1991, 56 Fed.Reg. 45,826, and was made final, without material alteration, on August 19, 1992. 57 Fed.Reg. 37,678. The regulation provides as follows:

> "An employee of a public agency who otherwise meets the requirements of § 541.118 shall not be disqualified from exemption under §§ 541.1, 541.2, or 541.3 on the basis that such employee is paid according to a pay system established by statute, ordinance or regulation, or by a policy or practice established pursuant to principles of public accountability, under which the employee accrues personal leave and sick leave and which requires the public agency employee's pay to be reduced or such employee to be placed on leave without pay for absences for personal reasons or because of illness or injury of less than one work-day when accrued leave is not

used by an employee because ... accrued leave has been exhausted."

29 C.F.R. § 541.5d. Therefore, the only issue is whether the plaintiffs were paid "on a salary basis" prior to September 6, 1991. *See, e.g., Michigan Ass'n of Gov't Employees,* 992 F.2d 82, 83 (6th Cir.1993).[7]

More precisely, the issue is whether the City's policy of permitting partial day deductions for absences of less than a day requires a conclusion that Commanders are not paid on a salary basis. Two courts of appeals that have considered the question have held that § 541.5d is prospective only and that, accordingly, government employees were not paid on a salary basis if they were "subject to" partial day deductions for absences prior to September 6, 1991. *See Michigan Ass'n of Gov't Employees,* 992 F.2d at 84 n. 1; *Kinney v. District of Columbia,* 994 F.2d 6, 10 (D.C.Cir.1993). In reaching their holdings, these courts relied upon the fact that in promulgating the "public employee" exception in § 541.5d, the DOL withdrew a proposed regulation that would have given the exemption retroactive effect because it concluded that such a change would have constituted invalid retroactive rulemaking under *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *Michigan Ass'n of Gov't Employees,* 992 F.2d at 84 n. 1 (*citing* 57 Fed.Reg. 37,678 (Aug. 19, 1992) (withdrawing a notice of proposed rulemaking originally published at 56 Fed.Reg. 45, 828 (1991))); *Kinney,* 994 F.2d at 10 & 11 n. 4 (adopting "theoretical violation theory," but "intimat[ing] no view on the question ... whether the Department's pre–1992 'subject to reduction' standard as applied to public employees is a legitimate exercise of its regulatory authority under the Act" because Department failed to make that argument before the district court).

▮▮▮ However, the court believes that the *Michigan Ass'n of Gov't Employees'* decision does not properly frame the issue. The question is not one of retroactivity, but rather one of congressional intent. As the final

---

7. Counsel for the plaintiffs has *not* briefed the issue of whether September 6, 1991 or August 19, 1992 is the date after which partial day deductions became permissible. Therefore, they have waived the issue. *See* Local R.Civ.P. 20(c) (setting forth briefing requirement). In any event, for reasons discussed *infra,* resolution of this question is unnecessary in the present case.

authority on issues of statutory construction, the judiciary "must reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A. v. Natural Resources Defense Counsel,* 467 U.S. 837, 843 & n. 9, 104 S.Ct. 2778, 2781 & n. 9, 81 L.Ed.2d 694 (1984); *see also Martinez v. Rhode Island Housing & Mortgage Finance Corp.,* 738 F.2d 21, 26 (1st Cir.1984) (*citing Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 399–400, 80 L.Ed. 528 (concluding that "a rule out of harmony with the statute is a mere nullity.")). Thus, the Court need not decide whether § 541.5d applies retroactively, but whether § 541.118(a) was consistent with Congress' intent to the extent that it was interpreted to eliminate the executive employee exemption for public employers utilizing partial day deductions for employees absent from work because of sickness or for personal reasons.

The DOL itself has concluded that its own regulations were contrary to Congress' intent to the extent that they were applied to public employers. Addressing the purpose behind § 541.5d, the DOL expressly stated that "Congress intended the Section 13(a)(1) ... exemption to be available for public employees." 57 Fed.Reg. 37672. However,

> Congress presumably was unaware that, because many public sector compensation systems preclude payment for hours not worked, these systems would, solely for that reason, be found to fail to meet the regulatory "salary basis" component of the exemption. In light of the public accountability principles prevalent in public sector pay systems, the regulatory requirements adopted before Congress extended FLSA coverage to State and local governments simply could not operate in a manner that effectively distinguished exempt from nonexempt public employees.

*Id.* Accordingly, the DOL concluded, "[t]he regulations were ... *out of harmony with the intent of the statute* because State and local governments could not practically avail themselves of the exemption intended by Congress, and thus were inappropriate as applied in the public sector." *Id.* (emphasis added).

██ The Court is persuaded that the City is not deprived of the executive exemption merely because it maintained a system under which employees were charged with partial day deductions from their accrued leave banks and, potentially, from their salaries as well.[8] Other courts have reached the same conclusion. *See Stewart v. City & County of San Francisco,* 834 F.Supp. 1233, 1238 (N.D.Cal.1993); *Mueller v. Thompson,* 858 F.Supp. 885, 896–97, 899 (W.D.Wis.1994). The Court concludes that, even before September 6, 1991, the City did not violate § 541.118 by maintaining a policy under which employees were charged with accrued leave time when absent and which allowed for the possibility of actual deductions from salary.

### b. Disciplinary Suspensions

██ Alternatively, the plaintiffs argue that the City's disciplinary policy is inconsistent with the definition of a salaried employee. Executive employees are those who receive a salary that is not "subject to" deduction based on the *quality* or quantity of work performed. 29 C.F.R. § 541.118(a). The DOL's regulations expressly permit employers to reduce an employee's pay if the employee violated "safety rules of major significance". *Id.* § 541.118(a)(5). If an employee is paid "on a salary basis" even though the employee's pay is subject to reduction for violation of major safety rules, then, by negative implication, an employee is *not* paid on a salary basis if he or she is subject to a reduction in pay due to a violation of "minor" safety rules or other rules adopted by his or her employer. *See, e.g., Shockley,* 997 F.2d at 24; *Klein v. Rush–Presbyterian–St. Lukes Medical Ctr.,* 990 F.2d 279, 285 (7th Cir. 1993). Thus, there are two questions to be resolved. First, whether the plaintiffs' pay is

---

**8.** The Court recognizes that there is unrebutted testimony to the effect that the Commanders were never actually docked pay due to a partial-day absence. However, the Court's conclusion that a policy allowing for partial day deductions is consistent with the notion of a salaried employee obviates the need to consider the City's argument that the executive employee exemption is not lost unless an employee has *actually* been docked salary because of a partial-day absence.

"subject to" reduction because of a violation of disciplinary rules. And second, whether, under the applicable directives, the City imposes discipline upon Commanders for violations of "safety rules of major significance". The Court will address the latter question first.

### (1) Safety Rules of Major Significance

The City argues that under its disciplinary policy, discipline is imposed only when there has been a violation of a major safety rule. It is undisputed that the City's disciplinary policy is contained in the Disciplinary Code of the Philadelphia Police Department ("Disciplinary Code"), dated November, 1982. The Disciplinary Code provides for a range of penalties up to and including suspension without pay for a wide array of violations. For example, under the Disciplinary Code, a Commander could be suspended without pay for, *inter alia*, allowing a prisoner to escape through carelessness or neglect, for being asleep on duty or for improper use, handling or display of firearms. (Stip. ¶ 30 & Ex. 11). On the other hand, a Commander could also be suspended for up to five days for such seemingly minor offenses as refusal to obey proper orders from superiors, using profane or insulting language to superior officers, failure to be home without a legitimate reason, after reporting off sick, failure to obtain medical treatment or certificate while on sick leave when required, omitting, altering, or abbreviating title when addressing any superior officer, failure to properly salute when in uniform and changing residence without giving 24 hours prior notification. *Id.*

In the City's view, all of its disciplinary rules constitute major safety rules because the Police Department is a paramilitary organization, in which maintaining proper discipline is essential for the department to function properly. However, courts have properly rejected the notion that " 'disciplinary infractions by law enforcement personnel could be construed as safety violations inasmuch as any breakdown in discipline may ultimately be seen to jeopardize public health.' " *Shockley*, 997 F.2d at 25 (*quoting Pautlitz v. City of Naperville*, 781 F.Supp. 1368, 1372 n. 6 (N.D.Ill.1992)). The *Pautlitz* court con-

cluded, correctly in this Court's view, that such considerations would "find a more comfortable home on a legislator's agenda." *Pautlitz*, 781 F.Supp. at 1372 n. 6.

Accordingly, courts have focused on the precise infractions for which discipline may be imposed and have not hesitated to conclude that the word "major" means what it says. In *Shockley*, for example, the Fourth Circuit concluded that a law enforcement officer's failure to report absences did not constitute a violation of a safety rule of major significance, and that the City's disciplinary policy, which permitted suspension without pay for such an infraction did not fall within the § 541.118(a)(5) exception. 997 F.2d at 25. Similarly, in *Pautlitz*, the court held that a law enforcement officer's acceptance of gratuities, in violation of department policy, did not constitute a violation of a "safety rule of major significance." *Pautlitz*, 781 F.Supp. at 1372 n. 6. Like the violations at issue in *Shockley* and *Pautlitz*, many of the violations for which unpaid suspensions may be imposed under the Disciplinary Code cannot be defined as "safety violations of major significance". However, this conclusion does not end the inquiry.

### (2) Whether an Actual Violation is Required?

Under the City's approach, the City does not lose the executive exemption unless it has actually docked one of the plaintiffs for a non-safety-related infraction. The City has produced evidence that none of the Commander plaintiffs were ever docked at all, let alone for violating a non-safety-related rule. (Defendant's Motion, Ex. N (Golden Aff., ¶ 23)). The plaintiffs have not produced any evidence to rebut the City's evidence concerning whether any plaintiff was actually docked because of a disciplinary violation. Rather, they argue that the mere potential that their pay will be reduced for violations of general disciplinary rules mandates a conclusion that they are not exempt executive employees, but rather, are non-salaried employees under § 541.118(a).

The courts are split on this issue. Some courts have read the words "subject to" as meaning that any time there is the potential

for reduction in pay due to an employee's violation of a general disciplinary rule, the affected employees are not paid "on a salary basis," and, therefore, are not exempt as executive employees. *See, e.g., Shockley,* 997 F.2d at 24; *see also Kinney,* 994 F.2d at 10–11 (holding that phrase "subject to reduction" encompasses plaintiffs' claims that employer's policy may theoretically result in reduction of salary based on quality or quantity of work); *Michigan Ass'n of Gov't Employees,* 992 F.2d at 85–86 (same); *Abshire,* 908 F.2d at 487 (same); *Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 615 (2d Cir.1991) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). Other courts have held that an employer does not lose the Section 13(a) exemption merely because there is a policy in place that theoretically could result in a covered employee being docked. *See McDonnell v. City of Omaha,* 999 F.2d 293, 297 (8th Cir.1993) (holding that employees must show an actual loss of pay to benefit from partial day deduction exception); *Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800, 805 (11th Cir.1991) (same); *York,* 944 F.2d at 242 (holding that absent evidence of an actual deduction in pay, summary judgment is improper).

■ The Court is persuaded that the "actual violation" approach advocated by the Fifth, Eighth and Eleventh Circuits is the better reasoned approach, especially in the context of a public employer, such as the City of Philadelphia. Accordingly, the Court holds that the Disciplinary Code does not deprive the City of the executive employee exemption.

### c. The Effect of Paying Overtime to Commanders

The plaintiffs final challenge under the salary basis test involves the City's overtime payment practices with respect to Commanders. Specifically, the plaintiffs argue that because Commanders receive compensatory time pursuant to the CBA for time worked in excess of their daily shift, Commanders are not salaried employees under the FLSA. The plaintiffs have failed to cite any statuto-

ry or regulatory authority for their argument.

In fact, the plaintiffs' argument is contrary to the governing regulations. First, § 541.118(a) requires that the predetermined amount constitute "all or *part*" of the employee's compensation. 29 C.F.R. § 541.118(a) (emphasis added). Thus, at the very least, it is clear that the regulations do not prohibit increases in compensation because of the quality or quantity of work performed. Indeed, the principal regulation contemplates the possibility of such increases. Moreover, any doubt as to whether compensation may be paid in addition to salary is removed by § 541.118(b), which expressly provides that "additional compensation besides the salary is not inconsistent with the salary basis of payment." 29 C.F.R. § 541.118(b). Relying upon § 541.118(b), several courts of appeals that have addressed the issue have properly concluded that an employer does not lose the executive exemption merely because it provides compensatory time to its employees in addition to a fixed salary. *See Michigan Ass'n of Gov't Employees,* 992 F.2d at 84 n. 3; *York,* 944 F.2d at 242.

Instead of addressing the potential applicability of § 118(b), the plaintiffs have directed the court to the Third Circuit's opinion in *Brock* as support for their position. In *Brock,* employees literally punched in and out on a time clock to record their hours worked. Further, although employees were "guaranteed" a minimum salary of $250 per week, they were not paid if they did not work at least 40 hours in a week. However, most employees easily met the $250 minimum, then received an hourly wage for additional time worked. *See Brock,* 846 F.2d at 181–82.

The *Brock* court found that the $250 minimum guarantee was a mere sham, and that the employees were actually paid by the hour. *Id.* at 184. This was based on the fact that the employees' actual take home salary varied tremendously and in exact correlation with the hours worked by the employee. *Id.* In other words, under *Brock,* "employees are not paid on a salary basis if the predetermined amount is so far below their actual compensation (calculated on an hourly basis)

that the minimum is 'nothing more than an illusion.'" *Michigan Ass'n of Gov't Employees*, 992 F.2d at 84 n. 3 (*citing Brock*, 846 F.2d at 183).

 The facts in the present case are clearly distinguishable from those in *Brock*. In the present case, the Commanders' salaries are not the illusory salaries criticized in *Brock*, but rather are consistent. The parties have stipulated that "employees of the Philadelphia Police Department receive an annual salary which is paid on a bi-weekly basis." (Stip., ¶ 20). The Commander plaintiffs themselves testified that they receive the same amount of pay each week regardless of the hours they work. (Defendant's Motion, p. 64. n. 69) (setting forth deposition testimony). All of the evidence in the instant case indicates that Commanders receive a set salary predicated on their rank and tenure, not a highly variable amount predicated on the number of hours worked during the week. Thus, *Brock* is not controlling. In accordance with the reasoning set forth in *Michigan Ass'n of Gov't Employees*, the Court holds that the plaintiffs in Counts III and IV, that is, the Commander plaintiffs, meet the salary basis test.

### 2. The Duties Test

Each Commander plaintiff argues that his primary duty is not management, and that, accordingly, he is not an "executive employee". The Third Circuit has found the DOL's regulations to be instructive in defining the term "primary duty". *See Guthrie*, 722 F.2d at 1144. In *Guthrie*, the court cited § 541.103 as the defining standard. *See id.* Under *Guthrie*,

"a determination of whether an employee has management as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee. In the ordinary case it may be taken as a rule of thumb that primary duty means the major part, or over 50 percent of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management

as his primary duty. Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Some of these pertinent factors are the relevant importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of non-exempt work performed by the supervisor."

*Id.* (*quoting* 29 C.F.R. § 541.103).

 The current record does not enable the Court to determine, as a matter of law, whether the Commanders' "primary duty" is management. Whether a particular duty is managerial is a legal question "governed by the pertinent regulations promulgated by the Wage and Hour Administrator." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986). In contrast, the amount of time devoted to managerial duties, and the significance of those duties, present factual questions. *See id.* (concluding that deviation from 50% "rule of thumb" ... requires consideration of the factual circumstances for which a jury is more appropriate); *Shockley*, 997 F.2d at 26.

The City has offered generic job descriptions for each class of Commanders. The City has also offered the plaintiffs' deposition testimony, which would support a finding that the Commanders' actual duties are those set forth in their job descriptions. However, the Court cannot ascertain the percentage of work attributable from the evidence adduced by the City, nor can it determine each class of Commander's relative freedom from supervision or the *relative* importance of managerial duties as compared with other activities. These determinations must await a fuller airing of the evidence. Because the Court cannot determine whether Commanders meet the "duties test," it cannot determine, at this stage of the litigation, whether Com-

**490**

manders are exempt "executive employees" under Section 13(a).

### G. Claims of Retired Commanders in Count IV

Alternatively, the City argues that it is entitled to summary judgment as to the claims of retired Commanders, which are contained in Count IV. The City argues that these employees have already been paid compensatory time in the form of salary at the time of their retirement, and that, accordingly, they are not entitled to any further relief. The City has not cited any authority for its argument. In any event, the City's argument is unpersuasive. Although the retired Commanders· may well have received compensation for a portion of their compensatory time, it is not clear that they received all the compensation they were due. Accordingly, as in the case of the active Commanders, the retired Commanders' claims must be resolved at trial.

### H. Liquidated Damages

■ The plaintiffs argue that they are entitled to summary judgment on the issues of liquidated damages, wilfulness, and attorney's fees under the FLSA. As the City correctly observes, the parties have agreed to bifurcate the issues of liability and damages. Presently before the Court are the parties motions for summary judgment regarding liability. Under the Scheduling Order currently in effect, the period for discovery as to damages has not ended. Thus, summary judgment on damages issues would be premature.

### V. CONCLUSION

There is a genuine issue of fact as to whether the City adopted a 13–day work period pursuant to § 207(k). Further, there is a genuine issue of material fact as to whether the plaintiffs receive a daily 30–minute meal period, which should be deducted from their total number of hours worked. There is also a genuine issue of material fact as to whether, by preparing the daily roll call, sergeants and lieutenants "work" an extra fifteen minutes per day for which they receive no compensation. In addition, the

existence of a genuine issue of material fact as to whether the Commanders' primary duty is management precludes the entry of summary judgment with respect to the Section 13(a) executive employee exemption. Finally, the plaintiffs have sought liquidated damages prematurely.